**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JOSHUA NEWLON,

Plaintiff,

v.

ANTON SAGAN and
JUICY BREWING, LLC,

Defendants.

Civil Action No 1:25-cv-1940-AJT-WEF

## REPORT AND RECOMMENDATION

This matter comes before the Court on Plaintiff Joshua Newlon's ("Plaintiff" or "Mr. Newlon") Motion for Default Judgment against Defendant Juicy Brewing, LLC ("Defendant" or "Juicy Brewing") pursuant to Federal Rule of Civil Procedure 55(b)(2) ("Fed. R. Civ. P."). Dkt. No. 14.[1] The Complaint charges investment fraud. Dkt. 1. In short, Mr. Newlon alleges that Mr. Sagan, the sole owner of Juicy Brewing, LLC, fraudulently induced him to invest $350,000 in Juicy Brewing and then Mr. Sagan used Mr. Newlon's investment to pay for

---

[1]    This Motion applies only to Defendant Juicy Brewing, LLC and not to Defendant Sagan. To date, Plaintiff not been able to effect service of process on Mr. Sagan even though Plaintiff has made reasonable attempts to do so. Plaintiff's investigation has sufficiently established that Mr. Sagan is no longer in the United States and is likely residing in Russia, which currently does not assist the United States in providing notice to parties under the Hague Convention. *See Microsoft Corp. v. Doe*, Civil Action No. 1:13-cv-139, 2014 U.S. Dist. LEXIS 48398, at *5-*7 (E.D. Va. Jan. 6, 2014) (explaining that "[t[he Russian Federation no longer complies with formal requests for judicial assistance pursuant to the Hague Convention from the United States."). Plaintiff has requested authorization to serve Mr. Sagan, a foreign national living in Russia, by email. Dkt. 11. The undersigned has granted Plaintiff's request (Dkt. 19) but given that once service is effected the defendant has 90 days to answer pursuant to Fed. R. Civ. P. 12(a)(1)(A)(ii) and Plaintiff's Motion for Default against Defendant Juicy Brewing is pending, the undersigned is submitting this Report and Recommendation only against Juicy Brewing.

personal expenses and to fund other businesses owned by Mr. Sagan. *Id*. Mr. Newlon's Complaint alleges three causes of action against Juicy Brewing: Count I asserts a claim for common law fraud; Count IV asserts a claim for fraudulent conveyance; and Count V asserts a claim for federal securities fraud under the Securities Exchange Act of 1934 (the "Exchange Act").

Pursuant to 28 U.S.C. § 636(b)(1)(C), the undersigned United States Magistrate Judge has reviewed the record and the pleadings, and for the reasons that follow, recommends the Court:

(1) **GRANT** Plaintiff's Motion for Default Judgment against Juicy Brewing on Count I (Common Law Fraud);

(2) **DISMISS** with prejudice Counts IV (Fraudulent Conveyance) and V (Securities Fraud);

(3) **ENTER** judgment against Juicy Brewing in the total amount of $373,309.52, consisting of (i) $350,000 in compensatory damages and (ii) $23,309.52 in attorney's fees and costs; and

(4) **AWARD** post-judgment interest, to be calculated in accordance with 28 U.S.C. § 1961, on the awarded compensatory damages and attorney's fees and costs.

**I. Entry of Default and Default Judgment Pursuant to Fed. R. Civ. P. 55**

Rule 55 of the Federal Rules of Civil Procedure calls for a two-step process for obtaining a default judgment. First, the plaintiff must request entry of default by the Clerk of Court against the defendant for "fail[ure] to plead or otherwise defend," by which liability is admitted. *See* Fed. R. Civ. P. 55(a); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F. 3d 114, 128 (2d Cir. 2011). Next, the plaintiff must apply to the Court for the actual default

judgment, which "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled…." *Mickalis Pawn Shop, LLC*, 645 F. 3d at 128; FED. R. CIV. P. 55(b)(2).

"A court confronted with a motion for default judgment is required to exercise sound judicial discretion in determining whether the judgment should be entered, and the moving party is not entitled to default judgment as a matter of right." *JTH Tax, Inc. v. Grabert,* 8 F. Supp. 3d 731, 736 (E.D. Va. 2014). On a motion for default judgment, the defendant in default is deemed to have admitted the complaint's non-conclusory "well-pleaded allegations of fact" and the Court is to determine whether those facts state a valid facial claim for relief as a matter of law. *GlobalSantaFe Corp. v. Globalsantafe.com,* 250 F. Supp. 2d 610, 613 n.3 (E.D. Va. 2003); *Grabert*, 8 F. Supp. 3d at 736, 739 (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face); *Burbach Broad Co. of Delaware v. Elkins Radio Corp.*, 278 F. 3d 401, 406 (4th Cir. 2002) (court will "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor"). Damages alleged in the Complaint, however, are not deemed admitted by a defaulting defendant. Rather, the Court "must make an independent determination regarding damages," including by reliance on affidavits or documentary evidence in the record. *See Wilcox v. Transmodal Solutions, LLC*, 473 F. Supp. 3d 574, 584 (E.D. Va. 2020); Fed. R. Civ. P. 8(b)(6).

## II. Procedural Background

On November 3, 2025, Mr. Newlon filed the Complaint against Defendants Juicy Brewing and its sole member, Anton Sagan.  Dkt. 1. The Complaint alleges that in July 2024, Mr. Sagan

solicited Mr. Newlon to invest $350,000 in Juicy StPete, LLC ("Juicy South") in exchange for a 55% membership interest in that company. Compl. ¶ 13. Mr. Sagan represented to Mr. Newlon that the investment would be used to fund and launch Juicy South's brewery operations. *Id.* at ¶ 14. Relying on these representations, on July 19, 2024, Mr. Newlon signed the Juicy South Operating Agreement (the "Agreement") and, in June and July 2024, transferred a total sum of $350,000 to Juicy Brewing's bank account. *Id*. at ¶ 15, 19; Decl. Newlon, at ¶ 5. The Agreement granted Plaintiff a 55% interest in Juicy South and included a mandatory arbitration clause and choice-of-law provision stating that the Agreement would be "construed and administered in accordance with the laws of the State of Florida." Compl., Ex. P1.

Mr. Newlon alleges that, contrary to Mr. Sagan's representations, his $350,000 investment was not used to launch or support Juicy South's operations. Instead, the funds were improperly diverted to other businesses in which Mr. Sagan alone held an interest, as well as to support Mr. Sagan's personal lifestyle. *Id*. at ¶ 20. Mr. Newlon further alleges that, as a result of the diversion of his investment and the resulting undercapitalization of Juicy South, Juicy South never launched its brewery operations, became insolvent, and was ultimately evicted from its leased premises for failure to pay rent. *Id.* at ¶¶ 26-27. According to the Complaint, Juicy South no longer operates any business or generates any income, and Mr. Newlon's investment has not been repaid. *Id.* ¶¶ 28–29.

The Complaint alleges the following: Count I asserts a claim for common law fraud against both Mr. Sagan and Juicy Brewing; Count II asserts a claim for conversion against Mr. Sagan alone; Count III asserts a claim for breach of fiduciary duty against Mr. Sagan alone; Count IV asserts a claim for fraudulent conveyance against Juicy Brewing alone; and Count V asserts a claim for federal securities fraud against both Juicy Brewing and Mr. Sagan. Dkt. 1. Mr. Newlon seeks

an award of $350,000.00 in compensatory damages relating to his claims for fraud and conversion and $23,309.52 in attorney's fees and costs. Mem. Supp. at 7; Dkt. 18-4.

Plaintiff effectuated service of the Summons and Complaint on Juicy Brewing on December 2, 2025. Dkt No. 6. After failing to appear or otherwise respond to the Complaint, on February 18, 2026, the Court ordered Plaintiff to obtain a default from the Clerk of the Court pursuant to Fed. R. Civ. P. 55(a). Dkt. No. 7. Additionally, the Court ordered Plaintiff to file a motion for default judgment and an accompanying memorandum in support after obtaining entry of default. *Id.* On February 27, 2026, Plaintiff filed a request for entry of default against Juicy Brewing. Dkt. No. 10. On March 3, 2026, the Clerk of the Court entered default against Juicy Brewing for failure to plead or otherwise defend. Dkt. No. 13. On March 18, 2026, Plaintiff filed a Motion for a Default Judgment, a memorandum of law in support, and notice of hearing Dkt. Nos. 14–16. The hearing on the Motion was held on April 10, 2026, at which counsel for Plaintiff appeared but no one appeared on behalf of Juicy Brewing failed. Dkt. No. 17. The Court then took the Motion for a Default Judgment under advisement to issue this Report and Recommendation.

**III. Service of Process**

Before a court can render a default judgment, it must be satisfied that the defaulting party has been properly served. Under Fed. R. Civ. P. 4(h), a corporation may be served, in relevant part, "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires— by also mailing a copy of each to the defendant." Under Fed. R. Civ. P. 4(m), Plaintiff was required to effectuate service on Defendant within 90 days of filing the Complaint.

On December 2, 2025, less than a month after filing the Complaint, Plaintiff's process server served Juicy Brewing by providing the summons, Complaint, and related materials to Annie Towers, who is designated by law to accept service of process on behalf of Juicy Brewing. Dkt. No. 6. In fact, Ms. Towers "identified herself as the person authorized to accept" service of process. *Id*. Ms. Towers was served at 8401 Mayland Dr, Ste A, Henrico, Virginia 23294, which is the address of Juicy Brewing's registered agent. Mem. Supp. at 5; Ex. 1. Accordingly, the record establishes that Juicy Brewing was timely and properly served in compliance with the Federal Rules of Civil Procedure.

**IV. Jurisdiction**

Before entering default judgment in this matter, the Court must have (1) subject-matter jurisdiction over the claims asserted and (2) personal jurisdiction over Defendant Juicy Brewing.

*First*, the undersigned finds that this Court has proper subject-matter jurisdiction under 28 U.S.C. § 1331, which vests the United States district courts with exclusive original jurisdiction over cases involving federal claims. Mr. Newlon's claim under the Exchange Act arises under federal law. *See Gunn v. Minton*, 568 U.S. 251, 257 (2013) ("[A] case arises under federal law when federal law creates the cause of action asserted.").

Where the district court has original jurisdiction over an action, it also has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy " 28 U.S.C. § 1367. Here, the undersigned finds that the Court has supplemental jurisdiction over Mr. Newlon's common law fraud and fraudulent conveyance claims because they arise from the same scheme to defraud alleged in the Exchange Act violation.

The Court may also exercise subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2), which grants federal district courts original jurisdiction over civil actions where the amount in controversy exceeds $75,000 and the dispute is between "citizens of a State" and "citizens or subjects of a foreign state." Section 1332(a)(2) further provides that diversity jurisdiction does not exist where the foreign citizen has been lawfully admitted for permanent residence in the United States and is domiciled in the same state as the opposing party. "In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State." *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828 (1989). In turn, domicile is established by physical presence in a jurisdiction coupled with "positive or presumptive proof of an intention to remain there for an unlimited time." *Mitchell v. United States*, 88 U.S. (21 Wall.) 350, 352 (1874).

For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all of its members. *Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). Moreover, subject to limited exceptions not applicable here, Section 1332 requires complete diversity among parties such that that the citizenship of every plaintiff is different from the citizenship of every defendant. *Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (citing *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996)).

Here, Plaintiff seeks damages of at least $350,000.00, which is well in excess of the $75,000.00 threshold. In addition, the record reflects that complete diversity exists among the parties. Mr. Newlon resides in Williamsburg, Virginia and is a citizen of the Commonwealth of Virginia for diversity purposes. In contrast, the record reflects that Mr. Sagan is a citizen or subject of a foreign state for diversity purposes.

In response to the Court's request for additional factual support for Plaintiff's claims regarding Mr. Sagan's domicile and citizenship, Mr. Newlon submitted (1) a supplemental brief (Dkt. No. 18); (2) a declaration from K. Scarry (Dkt. No. 18-1), who worked with Mr. Sagan on multiple business ventures over a three-year period; and (3) an investigative report prepared by Beacon Investigative Solutions concerning Mr. Sagan's personal assets and residency status (Dkt. No. 18-2). These materials reflect that Mr. Sagan is an Australian citizen currently residing in Russia along with his family, does not possess a United States Social Security number, never resided in the United States with an intent to remain indefinitely, and only entered the United States on visitor status. These materials further reflect that Mr. Sagan has been associated with only various commercial properties in Virginia and Florida, rather than any identifiable long-term residential property. Dkt. No. 18-1. While Mr. Sagan was physically present in Virginia during the relevant period, the record reflects that his presence in the jurisdiction was only temporary and that Mr. Sagan purchased a home and established permanent residence in Russia during the same period. Supp. Mem. at 7. In addition, a nationwide search did not identify any U.S. bank accounts associated with Mr. Sagan, and searches of federal retirement and benefit-plan filings revealed no pension, 401(k), or similar employment-related plans connected to him. Dkt. No. 18-2. Searches of national deed and tax assessment databases likewise did not identify any currently owned or recently owned real property in the United States associated with Mr. Sagan. *Id.*

Accordingly, the record establishes that Mr. Sagan is a citizen or subject of a foreign state for purposes of Section 1332(a)(2). Because Mr. Sagan is the sole member of Juicy Brewing, Juicy Brewing assumes Mr. Sagan's foreign citizenship for diversity purposes.

Therefore, the Court may properly exercise diversity jurisdiction over the instant Motion for Default Judgment.

*Second*, the undersigned finds that the Court has personal jurisdiction over Juicy Brewing. In cases where a district court's jurisdiction is predicated on a federal question, the Constitution's due process clause permits personal jurisdiction where a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The Fourth Circuit has directed district courts to consider the following three factors in determining whether a court's exercise of personal jurisdiction comports with the Constitution's due process requirements: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Dmarcian, Inc. v. Dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2022) (citing *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020)).

Likewise, a federal district court sitting in diversity derives personal jurisdiction based on the long-arm statute of the state in which it sits. *Barry v. Whalen*, 796 F. Supp. 885 (E.D. Va. 1992). Accordingly, the statute which controls here is the Virginia long-arm statute contained in Va. Code § 8.01–328.1. Under Va. Code § 8.01–328.1, the plaintiff must prove two elements to establish personal jurisdiction. "First, she must prove that the statutory language of the long-arm statute permits service of process under the particular facts and circumstances on a non-resident defendant, and then she must prove that the exercise of personal jurisdiction does not violate the Due Process Clause of the United States

Constitution." *Dunham v. Hotelera Canco S.A. de C.V.*, 933 F. Supp. 543, 552 (E.D. Va. 1996) (citations omitted). Here, the undersigned finds that the Court's exercise of personal jurisdiction over Juicy Brewing comports with due process and is authorized by Virginia's long-arm statute.

The provision of the Virginia long-arm statute that is most applicable here is § 8.01–328.1(A)(1), which authorizes personal jurisdiction over a defendant "as to a cause of action arising from the person's … transacting any business in this Commonwealth." Va. Code § 8.01–328.1(A)(1). "The scope of the transacting business requirement is limited only by the boundaries of due process." *Dunham,* 933 F. Supp. at 553 (citing *Bassett Furn. Indus., Inc. v. Sexton*, 596 F. Supp. 454, 456 (W.D. Va. 1984)). "A single act of business will suffice if the action arises from that same transaction." *Id.* (citing *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 391, 396 (E.D. Va. 1984)). "The phrase 'arising from' requires that there be a causal link between the acts relied on for personal jurisdiction and the cause of action asserted." *Id.* (citing *Chedid v. Boardwalk Regency Corp*., 756 F. Supp. 941, 943 (E.D.Va.1991)). "The causal link requires more than simple 'but-for' causation; it requires something akin to legal or proximate causation." *Id.* (citing *Chedid v. Boardwalk Regency Corp*., 756 F. Supp. 941, 943 (E.D.Va.1991)).

The Court has personal jurisdiction over Juicy Brewing pursuant to Va. Code § 8.01-328.1(A)(1) for several reasons. First, Juicy Brewing is a Virginia limited liability company, with a principal place of business located at 257 Sunset Park Dr, Herndon, Virginia 20170, and a registered agent located at 8401 Mayland Dr Ste A, Henrico, Virginia 23294. Dkt. 15-1. Second, the alleged fraudulent scheme arose from the solicitation and inducement of Plaintiff's investment through representations made in Virginia and the execution of the Agreement,

10

which was signed by Mr. Newlon, Mr. Sagan on behalf of Juicy Brewing, and K Scarry, each of whom listed a Virginia address as their point of contact in the Agreement. Compl., Ex. P1.

Next, the undersigned finds that the exercise of personal jurisdiction over Juicy Brewing comports with due process. The alleged fraud and diversion of Mr. Newlon's investment funds stemmed from Juicy Brewing's business activities in Virginia, were intentionally directed at a Virginia resident, caused injury in Virginia, and were knowingly orchestrated through Mr. Sagan's conduct in Virginia. Under these circumstances, permitting Juicy Brewing to avoid accountability in Virginia merely because Juicy South's operations were to be located in Florida would offend "traditional notions of fair play and substantial justice."

### V. Effect of the Mandatory Arbitration and Choice-of-Law Provisions

1. <u>Arbitration Provision</u>

While not referenced by Plaintiff in any of his pleadings, the undersigned must determine the effect of the Agreement's mandatory arbitration provision on the Court's adjudication of Mr. Newlon's claims and entry of default judgment. Specifically, the Agreement contains a broad dispute resolution provision that provides as follows:

> The Members agree to use their best efforts to resolve any disputes that may arise under this Agreement by mutual agreement within thirty (30) days after one Member provides written notice of the dispute to the other Members. If the Members cannot resolve the dispute within that time frame, then any Member may submit the dispute to arbitration. Each Member irrevocably agrees that all claims, legal actions, suits, disputes, and proceedings (collectively "Claims") that are not resolved by mutual agreement of the Members, arising out of or relating to this Agreement, will be settled by binding arbitration to be held in Pinellas County, Florida in accordance with the Commercial Arbitration Rules then in effect of the American Arbitration Association ("AAA"). This Agreement shall be construed and administered in accordance with the laws of the State of Florida.
>
> a) The arbitration will be before one arbitrator mutually selected by the Members. If the Members do not agree regarding the selection of an arbitrator, the AAA shall select the arbitrator.

11

b) The arbitrator may grant injunctions and other equitable relief.

c) Each Member will bear its own costs, including attorneys' fees.

d) Within forty-five (45) days after the filing of the response to the arbitration demand, each Member will provide the other with copies of all documents that are likely to bear significantly on their respective claims and defenses.

e) The arbitrator may allow the Members to engage in other discovery, including depositions, only if the arbitrator determines that the likely benefit of the proposed discovery outweighs the burdens and expenses of the proposed discovery, taking into account the needs of the case, the amount in controversy, the importance of the issues at stake in the arbitration, and the importance of the proposed discovery in resolving the issues. The arbitrator's decisions regarding discovery will be final and conclusive.

f) The final decision of the arbitrator shall be final and conclusive and binding upon the Members. Judgment upon award rendered by the arbitrator may be entered in any court of competent jurisdiction. The arbitrator will have no authority to make any ruling, finding or award that does not strictly conform to the terms and conditions of this Operating Agreement.

Compl., Ex. P1.

"The Federal Arbitration Act empowers federal courts to stay proceedings upon application of one of the parties where there is a valid and controlling arbitration agreement in place between the parties." *Farnsworth v. PublishAmerica, LLLP*, No. CV L-07-241, 2009 WL 10682047, at *2 (D. Md. Feb. 17, 2009) (citing 9 U.S.C. S 3). The Act further authorizes federal courts to "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. S 4. "In combination, these sections mean that either party may invoke the arbitration clause and force the other party into binding arbitration." *Farnsworth*, 2009 WL 10682047 at *2 2009. However, "[w]here neither party has invoked the arbitration provision in the contract the Court need not decide the validity of that provision." *Cherry, Bekaert & Holland v. Downs*, 640 F. Supp. 1096, 1102 (W.D.N.C. 1986).

Here, neither party has invoked the Agreement's arbitration provision. Although the Court makes no finding that Defendants have permanently waived any contractual right to arbitration, arbitration is not self-executing and must be asserted by a party seeking its

12

enforcement. *See Fasig-Tipton Kentucky, Inc. v. Michaelson*, 955 F.2d 40 (4th Cir. 1992) ("The existence of a binding arbitration agreement is an affirmative defense that normally should be included in the answer to a complaint." (citing Fed. R. Civ. P. 8(c); *McDonnell v. Dean Witter Reynolds, Inc.*, 620 F. Supp. 152, 155 (D.Conn.1985)); *Williams v. Ali*, No. 1:18-CV-18, 2019 WL 11201549, at *6 n.3 (N.D.W. Va. Dec. 2, 2019), *report and recommendation adopted*, No. 1:18-CV-18, 2020 WL 4558904 (N.D.W. Va. Aug. 7, 2020) ("[T]he Defendants would need to assert [the Arbitration Clause] in an answer or other responsive pleading for it to be enforced in this action. Because the Defendants have failed to answer or otherwise file any responsive pleading to Plaintiff's Complaint and default has been entered against them, the Arbitration Clause should not be enforced."). Because Defendants failed to appear, otherwise respond to the Complaint, move to compel arbitration, or invoke the arbitration provision before the Clerk's entry of default, the undersigned finds that the Agreement's arbitration provision should not be enforced, and therefore, does not bar adjudication of Plaintiff's claims or entry of default judgment in this action.

2. Choice of Law Provision

Before reaching the merits of Plaintiff's claims, the Court must next determine the applicable law. *See, e.g.*, *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010) (noting that before addressing a motion to dismiss, "the Court must first resolve the choice of law question to determine the applicable law relevant to each [claim]"). Here, the Agreement contains a choice-of-law provision stating that it shall be "construed and administered in accordance with the laws of the State of Florida." Compl., Ex. P1.

"A federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia's choice of law rules." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 856

13

(E.D. Va. 2013). Under Virginia law, contractual choice of law provisions are generally enforced absent unusual circumstances. *LTD Mgmt. Co., LLC v. Holiday Hosp. Franchising, Inc.*, No. CIV.A. 2:07CV530, 2008 WL 7281926, at *10 (E.D. Va. Mar. 11, 2008) (citing *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir.1999). Where choice of law provisions are sufficiently broad, "a court should apply the provision to encompass contract-related tort claims as well." *Id.* However, courts in this district distinguish between broad choice-of-law provisions that encompass contract-related tort claims and narrower provisions that govern only interpretation or construction of the contract itself. *Id.*

In *LTD Management*, the district court held that a provision stating that the agreement "shall be governed and construed under, and in accordance with the laws and decisions (except any conflicts of law provisions) of the State of Georgia" was insufficiently broad to encompass related tort claims, including fraud. 2008 WL 7281926 at *10. The provision at issue here—which states that the Agreement "shall be construed and administered in accordance with the laws of the State of Florida"—is similarly narrow. Accordingly, the Court finds that the Agreement's choice-of-law provision does not extend to Mr. Newlon's claims at issue here.

## VI. Venue

Before entering default judgment against Juicy Brewing, the Court must be satisfied that venue is proper in this judicial district. Here, venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because, as discussed above, a substantial part of the events or omissions giving rise to Mr. Newlons' claims occurred in this judicial district. Compl. ¶ 8. Specifically, the material misrepresentations of facts, misappropriation of funds, and the contractual agreement which served to mask the fraud all occurred in this District. In addition, Juicy Brewing is a Virginia corporation.

14

**VII. Defendants' Liability**

On a motion for default judgment, the defendant in default is deemed to have admitted the complaint's non-conclusory "well-pleaded allegations of fact" and the Court must evaluate whether the complaint "states a claim upon which relief can be granted" by applying the standards used in motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 613 n.3 (E.D. Va. 2003); *Grabert*, 8 F. Supp. 3d at 736, 739 (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)); *see* also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face); *Burbach Broad Co. of Delaware v. Elkins Radio Corp*., 278 F.3d 401, 406 (4th Cir. 2002) (court will "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor"). "Where a complaint offers only 'labels and conclusions' or 'naked assertion[s] devoid of further factual enhancement,' the allegations therein are not well-pleaded and, consistent with the Court's discretion to grant default judgment, relief should be denied." *Vasquez-Padilla v. Medco Properties, LLC*, Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017) (collecting cases) (citations omitted).

1. Plaintiff's Well-Pleaded Allegations of Fact

The undersigned finds the following facts to have been properly pleaded and therefore deemed admitted.

Mr. Newlon is an individual citizen of Virginia, residing in Williamsburg, Virginia. Compl. ¶ 1. Juicy Brewing is a limited liability company organized under the laws of Virginia with a principal place of business at 257 Sunset Park Dr, Herndon, Virginia 20170. *Id.* at 3.

Mr. Sagan is a citizen of Australia, a resident of Russia, and the sole member of Juicy Brewing, LLC. *Id.* at 2, 4.

In or around July 2024, Mr. Sagan approached Mr. Newlon with a proposal to invest in a Florida brewery venture known as Juicy South. *Id.* ¶ 10. Juicy South was owned by Juicy Brewing, and Mr. Sagan acted as manager of Juicy South through his ownership interest in Juicy Brewing. Compl. ¶¶ 11–12. Mr. Sagan proposed that Mr. Newlon invest $350,000.00 in exchange for a 55% ownership interest in Juicy South and represented that the investment would be used to "fund Juicy South and commence its brewery operations." *Id*. ¶¶ 13–14.

In reliance on these representations, Mr. Newlon executed the Operating Agreement on July 19, 2024. *Id.* ¶ 15. The Agreement has been submitted to the Court as an exhibit to the Complaint. Compl., Ex. P1. The Agreement reflects that Mr. Newlon was required to make a $350,000 capital contribution in exchange for a 55% ownership interest in the company. *Id*. The Agreement was countersigned by K. Scarry in her individual capacity and by Mr. Sagan on behalf of Juicy Brewing. *Id*. Under the terms of the Agreement, Juicy Brewing and K. Scarry each maintained a 22.5% ownership interest in Juicy South.

On May 22, 2024, consistent with the terms of the Agreement, Mr. Newlon "transferred $50,000.00 via wire transfer to Juicy Brewing's checking account." Dkt. No. 15-2. On July 29, 2024, Mr. Newlon "transferred $300,000.00 via wire transfer to Juicy Brewing's checking account, totaling $350,000.00 in payments." *Id*. Also on July 29, 2024, Mr. Sagan sent Mr. Newlon a text message via WhatsApp confirming that Mr. Newlon's payments had been received. *Id.*; Compl. ¶ 19.

Contrary to Mr. Sagan's representations regarding how he would use Mr. Newlon's investment, the $350,000 was not used to fund or launch Juicy South's brewery operations, but

instead the funds were diverted to other business ventures in which Mr. Sagan held an ownership interest. *Id.* ¶ 20. Mr. Sagan also improperly diverted portions of Mr. Newlon's investment to fund his personal expenses. *Id.* ¶ 25. Mr. Sagan intended to misuse and misappropriate Mr. Newlon's funds from the time Mr. Sagan first solicited the investment from Mr. Newlon. *Id.* ¶ 24.

The Agreement also provided that Juicy South's profits were to be "distributed bi-annually in accordance with the Member's percentage of membership interest" with an exception for the "initial investment return timeframe." *Id.* ¶ 3.12. The Agreement specified that Mr. Newlon's initial capital contribution of $350,000 would "be expedited at 70/30 split of profit distribution until fully repaid (Joshua 70% / other members 30%)." *Id.* The Agreement also provided that "[u]pon a Member's request, the Company shall provide to the requesting Member information regarding the Company or its activities. Each Member or his/her authorized representative shall have access to and may inspect and copy all books, records and materials regarding the Company or its activities." *Id.* ¶ 4.4.

On February 4, 2025, in response to Mr. Newlon's request for information regarding the use of his investment, Mr. Sagan stated via email that there was "[n]o cash left." *Id.* ¶ 21. Mr. Sagan further explained that the investment had been part of a "complex deal," that the project had been underfunded, and that both Juicy Brewing and another entity called Studio 1333 LLC d/b/a Giggle Water in which Mr. Sagan held an ownership interest had "benefited from the deal." *Id.* ¶ 22. Mr. Newlon has no ownership interest in any of the other entities that "benefited" from his investment in Juicy South, including Juicy Brewing and Giggle Water. *Id.* ¶ 23.

As a result of the misappropriation and diversion of Mr. Newlon's investment funds, Juicy South never commenced operations, was subsequently evicted from its leased space for failure to satisfy its rental obligations, no longer conducts business operations, and generates no revenue or income. *Id.* ¶¶ 26–28.

After discovering the misappropriation of his $350,000 investment, Mr. Newlon demanded the return of his funds, but Mr. Sagan failed to return the investment. *Id.* ¶ 29. Mr. Newlon also requested profit-and-loss statements and other accounting records relating to Juicy South, which he is entitled to under the Agreement. *Id.* ¶ 30. Although Mr. Sagan represented that such documentation would be produced, no such records have been provided to Mr. Newlon and Mr. Newlon has not received any of his investment back under the terms of the Agreement. *Id.* ¶ 31.

2. Federal Rule of Civil Procedure 12(b)(6) Analysis

Now, as explained above, the undersigned must evaluate whether the Complaint states a "claim upon which relief can be granted" by applying the standards used in motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).

Having examined the record, the undersigned Magistrate Judge finds that the well-pleaded allegations of fact in the Complaint (Dkt. No. 1), supported by Plaintiff's Motion for Default Judgment (Dkt. No. 14), brief in support, (Dkt. 15.), and supplemental brief in support (Dkt. 18), establish that Juicy Brewing committed fraud. However, the undersigned finds that Mr. Newlon has failed to state a claim for fraudulent conveyance or a violation of the Exchange Act and, therefore, recommends dismissing both of those causes of action with prejudice.

A. *Common Law Fraud*

Count I of the Complaint asserts a claim for common law fraud against both Mr. Sagan and Juicy Brewing. Because Mr. Sagan is neither in default nor the subject of the instant Motion for Default Judgment, the undersigned addresses the claim only as to Juicy Brewing.

 "A limited liability company is a hybrid business organization that has characteristics of both a partnership and a corporation. It provides its owners the limited liability of a corporation, but the federal income tax treatment of a partnership." *Jordan v. Commonwealth,* 36 Va. App. 270, 272 (2001). An LLC is like "[a] corporation ... an inanimate, artificial being, having no power to act except through living agents." *Frazier v. Virginia Military Inst.*, 81 Va. 59, 61 (1885). "Like a corporation, a limited liability company is a legal entity entirely separate and distinct from the shareholders or members who compose it." *Mission Residential, LLC v. Triple Not Props., LLC.*, 275 Va. 157, 161 (2008). "An act of a member, including the signing of an instrument in the limited liability company name, for apparently carrying on in the ordinary course the limited liability company business or business of the kind carried on by the limited liability company, binds the limited liability company." *Alexander v. Colston, Kickin Chicken Poultry & Game Bird Farm, LLC*, 92 Va. Cir. 84 (2015) (citing VA Code § 13.1–1021.1(A)(2); *Orthopedic & Sports Physical Therapy Associates, Inc. v. Summit Group Properties, LLC*, 283 Va. 777, 785 (2012) ("If the fraud was committed in the ordinary course of the LLC's business, then fraudulent acts by one member of the LLC would bind it.")). Accordingly, an LLC may be bound by the fraudulent acts of its members when those acts are undertaken on the LLC's behalf and in the ordinary course of the LLC's business.

Under Virginia law, the elements of actual fraud are: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance

by the party misled, and (6) resulting damage to the party misled." *Winn v. Aleda Constr. Co.*, 227 Va. 304, 308 (1984).

As a threshold matter, the record establishes that Mr. Sagan undertook the conduct alleged in the Complaint, now deemed admitted, on behalf of Juicy Brewing and within the ordinary course of its business. Mr. Sagan solicited Mr. Newlon's investment in Juicy South, which the Agreement identifies as a subsidiary of Juicy Brewing. Compl., Ex. P1 ¶ 4.7. Accordingly, the purported purpose of the investment was to fund and operate Juicy Brewing's subsidiary and Mr. Sagan executed the Agreement on behalf of Juicy Brewing rather than in his individual capacity. *Id.* Finally, Mr. Newlon wired the $350,000 investment directly into Juicy Brewing's bank account. Dkt. No. 15-2 ¶ 5. These facts sufficiently establish, for purposes of default judgment, that Mr. Sagan acted on behalf of Juicy Brewing and within the scope of its business activities. *See Alexander*, 92 Va. Cir. at 84.

Next, the undersigned finds that Mr. Newlon has sufficiently established each element necessary to state a claim for common law fraud under Virginia law. Mr. Sagan, acting on behalf of Juicy Brewing, made a material misrepresentation when he represented to Mr. Newlon that the investment "would be used to establish and operate Juicy South." Mem. Supp. at 5; Compl. ¶ 33. That representation clearly and unambiguously conveyed that Mr. Newlon's investment funds would be used for the *exclusive* benefit of Juicy South, the only entity in which Mr. Newlon was to receive an ownership interest under the Agreement.

However, on or around February 4, 2025—approximately six months after Mr. Newlon transferred his $350,000 investment to Juicy Brewing—Mr. Newlon requested information concerning the use of his investment funds, and Mr. Sagan responded by email that there was "No cash left." Compl. ¶ 22. Mr. Sagan further explained that Mr. Newlon's investment was

part of a "complex deal," that the "overall project" was underfunded, and that both Juicy Brewing and Studio 1333 LLC d/b/a Giggle Water—both of which are entities in which Mr. Sagan held an equity interest, but in which Mr. Newlon held none—"benefited from the deal." *Id.* In his email response, Mr. Sagan essentially confessed to fraudulently misappropriating Mr. Newlon's investment by using the funds not to develop Juicy South but to finance other businesses, businesses which Mr. Sagan had an ownership interest, but Mr. Newlon did not. The Agreement was clear, Mr. Newlon made a $350,000 capital contribution to Juicy South in exchange for a 55% ownership interest in Juicy South. Any use of the investment funds for any other purpose is prima facie evidence of fraud.

The fact that Juicy South never launched and became insolvent approximately six months after receiving Mr. Newlon's $350,000 investment is additional evidence that the investment funds were improperly diverted. *Id.* ¶ 26. Moreover, Mr. Sagan's admission that Juicy Brewing and Giggle Water "benefited from the deal" and were part of the "overall project," despite never disclosing those material facts to Mr. Newlon, further demonstrates that Mr. Sagan knowingly misrepresented the intended use of Mr. Newlon's investment funds when soliciting the investment. The record supports the inference that Mr. Sagan always intended for Mr. Newlon's investment to benefit these other entities, which he viewed as components of a single integrated "project." The record further reflects that, after Mr. Newlon requested profit-and-loss statements and additional accounting records for Juicy South, Mr. Sagan represented that he would provide such documentation but ultimately failed to do so, despite Mr. Newlon being legally entitled to those materials under the Agreement. Compl. ¶ 30–31. This failure to produce the requested financial records further supports the inference that Mr.

21

Sagan knowingly and intentionally misappropriated Mr. Newlon's investment and then attempted to conceal his fraudulent conduct.

Mr. Sagan's misrepresentation was material and reasonably relied upon by Mr. Newlon as evidenced by the fact that the entire Agreement was predicated on funding and growing Juicy South. There is no evidence or inference that would suggest that Mr. Newlon authorized Mr. Sagan to use his investment for the benefit of any company other than Juicy South. It defies logic to believe that Mr. Newlon would have knowingly invested substantial funds in entities in which he held no ownership interest without receiving any corresponding compensation or benefit. Based on the record before the Court, including the plain language of the Agreement, Mr. Newlon relied on the materially false representations of Mr. Sagan when he invested $350,000 into Juicy South.

Finally, the record establishes that Mr. Newlon suffered significant financial harm because of Mr. Sagan's fraudulent misrepresentation. Juicy South never launched as an operating business, become insolvent, and was ultimately evicted from its leased premises for failure to pay rent. Because Juicy South does not presently operate any business or generate any income, Mr. Newlon's $350,000 investment is effectively gone.

For these reasons, the undersigned finds that Mr. Newlon has properly and sufficiently alleged a common law fraud. Accordingly, the undersigned recommends the Court grant Mr. Newlon's Motion for Default Judgment on this claim.

B. *Fraudulent Conveyance*

Count IV of the Complaint asserts a claim for fraudulent conveyance under Virginia state law against Juicy Brewing. Fraudulent transfers may be set aside under Virginia law pursuant to Va. Code § 55.1-400. "To prove an actual fraudulent transfer, a party must establish

22

the following elements: (1) a conveyance, (2) that was given with the intent to delay, hinder, or defraud creditors, (3) who were lawfully entitled to the subject of the conveyance, and (4) the purchaser either did not provide valuable consideration or had knowledge of the fraud or the fraudulent intent of the immediately prior grantor." *United States v. Kotzev*, No. 1:18-CV-1409, 2022 WL 212702, at *3 (E.D. Va. Jan. 24, 2022) (citing *C.F. Trust v. Peterson*, No. 97-cv-2003, 1999 WL 33456231, at *7 (E.D. Va. Jan. 8, 1999).

Mr. Newlon invested $350,000 in Juicy South in exchange for a 55% ownership interest in the company. The Agreement plainly contemplates that Mr. Newlon was an equity investor rather than a creditor, expressly providing that "[n]one of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company." Compl., Ex. P1 ¶ 6.6. Upon making the investment and receiving his ownership interest, Mr. Newlon did not retain a fixed right to repayment of the invested funds. Although the Agreement provided that Mr. Newlon would receive 70% of Juicy South's profits until his initial investment was repaid, any such return remained contingent on the company generating profits and did not create the type of unconditional repayment obligation ordinarily associated with a creditor relationship. *See Colin v. Wellford*, 102 Va. 581, 585 (1904) ("[W]hile it may be true that a stockholder may recover judgment against the corporation, and thus become, in a certain sense, a creditor thereof, he is nevertheless not a creditor within the meaning of our assignment laws.") (citations and quotation marks omitted); *Drewry-Hughes Co. v. Throckmorton*, 120 Va. 859, 865 (1917) ("It is well settled, however, that preferred stockholders are not creditors of the company, nor are the dividends as to which they may be preferred to be regarded as interest upon a loan.").

Accordingly, the record establishes that Mr. Newlon functioned as an equity investor, rather than a creditor, of Juicy South and did not otherwise possess a legal entitlement to the

23

investment funds. As a result, Mr. Newlon cannot properly state a claim under Va. Code § 55.1-400, and the fraudulent conveyance claim should therefore be dismissed.

C. *Private Federal Securities Fraud*

Count V of the Complaint asserts a claim for private federal securities fraud under the Exchange Act. "Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." *Id.* (citing 15 U.S.C. § 78j(b)). Rule 10b–5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." *Id.* (citing 17 CFR § 240.10b–5 (2004)). "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common law tort actions for deceit and misrepresentation." *Id.*

Critically here, to state a claim under Rule 10b-5, Mr. Newlon must establish fraud "in connection with the purchase or sale of any security." *Robinson v. Glynn*, 349 F.3d 166, 169–70 (4th Cir. 2003) (citing 17 C.F.R. § 240.10b-5; *Gasner v. Bd. of Supervisors of the Cnty. of Dinwiddie*, 103 F.3d 351, 356 (4th Cir. 1996)). The Exchange Act defines "security" to include, among other things, "stock" and "investment contracts." 15 U.S.C. § 78c(a)(10).

While the Complaint does not specifically allege how Mr. Newlon's investment qualifies as a "security" under the Exchange Act, Mr. Newlon argues in its supplemental brief in support of the Motion for Default Judgment that his membership interest in Juicy South, an

24

LLC, constitutes both an "investment contract" and "stock" within the meaning of the Exchange Act. Dkt. No. 18. The undersigned disagrees.

An investment contract is a "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey, Co.*, 328 U.S. 293, 298–99 (1946). Here, there is little dispute that Mr. Newlon invested money in a common enterprise with an expectation of profits. However, the Fourth Circuit has explained that the requirement that profits be derived solely from the efforts of others turns principally on the degree of control retained by the investor. *Robinson*, 349 F.3d at 171. The key question, therefore, is whether "an investor, as a result of the investment agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment." *Id.* at 170 (citations omitted).

The Agreement does not qualify as an investment contract under the Exchange Act because Mr. Newlon's membership interest in Juicy South afforded him substantial ownership, voting, and managerial authority over Juicy South. First, Mr. Newlon maintained a majority 55% ownership interest in Juicy South. The remaining two members, Juicy Brewing and K. Scarry, each held 22.5% ownership interests. In addition, Mr. Newlon was Juicy South's sole major investor.

Second, commensurate with his majority ownership stake, Mr. Newlon maintained a 55% voting interest under the Agreement, while Juicy Brewing and K. Scarry each maintained 22.5% voting interests. The Agreement's voting provision provided that: (1) "all votes of the Members shall be in accordance with their then existing Voting Interests in the Company"; and (2) "the affirmative vote by the holders of a majority of Voting Interests that are entitled

to vote thereon which are present in person at the meeting, shall be sufficient to approve, authorize, ratify, or otherwise consent to any proposed matter from time to time coming before the Members for a vote." Compl., Ex. P1. The Agreement further provided that "[t]here shall be no cumulative voting." *Id.* Accordingly, Mr. Newlon's 55% voting interest afforded him majority voting control over Juicy South, and neither Juicy Brewing nor K. Scarry, either on their own or together, possessed sufficient voting control to overrule him.

Lastly, the Agreement afforded Mr. Newlon substantial oversight authority over Juicy South's day-to-day operations. Although the Agreement designated K. Scarry as the Managing Member, the Agreement provided that "the Managing Member shall have duty to consult with, seek the advice of, or obtain the approval of, the Members in connection with the conduct of the day-to-day business of the Company." Compl., Ex. P1 ¶ 3.2. Accordingly, Mr. Newlon retained substantial contractual authority over the Managing Member's conduct of Juicy South's operations.

In essence, the Agreement reflects a closely held business arrangement in which Mr. Newlon held substantial ownership, voting, and managerial rights over Juicy South. Unlike a passive investor dependent solely upon the efforts of others, Mr. Newlon retained majority voting control and significant management rights over Juicy South's operations. Accordingly, the membership interest conveyed under the Agreement does not constitute an "investment contract" within the meaning of the Exchange Act.

Likewise, the undersigned finds that Mr. Newlon's membership interest in Juicy South does not qualify as "stock" under the Exchange Act. "The characteristics typically associated with common stock are (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of

26

voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Robinson*, 349 F.3d at 171. Mr. Newlon's membership interest in Juicy South lacks several of these characteristics.

First, Juicy South's members did not share in the profits in proportion to the number of their shares. Under the Agreement, profits were to be distributed on a temporary 70/30 basis until Mr. Newlon's initial $350,000 capital contribution was fully repaid, with Mr. Newlon receiving 70% of distributed profits and the remaining members collectively receiving 30%. Only thereafter did the Agreement provide that corrective distributions would be made to align profit allocations with the members' respective ownership interests. Compl., Ex. P1 ¶ 3.12.

Second, Mr. Newlon's membership interests were not freely negotiable. According to the Agreement, Mr. Newlon could only transfer his interests if he first offered other members the opportunity to purchase his interests on similar terms. Compl., Ex. P1 ¶ 4.6.

Finally, from the outset, Mr. Sagan, K. Scarry, and Mr. Newlon understood Newlon's investment to constitute a "membership interest," and the Agreement consistently characterized the investment as a "membership interest" rather than "stock." Mr. Newlon, therefore, "cannot argue that he was misled into believing that his membership interests were stock whose purchases were governed by the securities laws." *Robinson*, 349 F.3d at 171 (citing *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 693 (1985) (finding that calling instruments "stock" justifiably leads purchasers to believe that the federal securities laws apply)). In sum, "it would do violence to the statutory language of the securities laws to include within the term 'stock' an instrument that was neither labelled stock nor like stock." *Robinson*, 349 F.3d at 174.

Accordingly, Mr. Newlon has failed to establish that the transaction at issue involved the purchase or sale of a "security" within the meaning of the Exchange Act. Mr. Newlon's Exchange Act claim should therefore be dismissed in its entirety.

### VIII. Analysis of Plaintiff's Requested Relief

The Court must now "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). Damages must be established through "admissible, authenticated evidence." *Bd. of Trs. of the United Union of Roofers v. Dana Restoration, Inc*., 2010 WL 3925115, at *2 (E.D.N.Y. Sept. 14, 2010).

1. Compensatory Damages

Mr. Newlon seeks an award of $350,000.00 in compensatory damages, representing the amount of his investment in Juicy South. Mem. Supp. at 7. The Agreement, attached to the Complaint as Exhibit P1, together with Mr. Newlon's declaration (Dkt. 15-2), establishes that Mr. Newlon contributed a total of $350,000 toward Juicy South and has received no money in return.

The Fourth Circuit has explained that the "purpose of compensatory damages is to restore the injured party to the party's original condition, i.e., to make the party whole." *Jacobs v. Cent. Transp., Inc*., 83 F.3d 415 (4th Cir. 1996). Here, Mr. Newlon's $350,000 investment was diverted for the benefit of Juicy Brewing and Giggle Water without compensation and has neither been repaid nor returned to him. An award of $350,000 in compensatory damages is therefore appropriate to restore Mr. Newlon to the position he occupied before making the investment and to make him whole. Accordingly, the undersigned recommends that the Court enter judgment against Juicy Brewing in the sum of $350,000.

2. Attorney's Fees and Costs

The general rule under Virginia common law is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party. *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92 (1999) (citing *Gilmore v. Basic Industries, Inc.*, 233 Va. 485, 490, 357 S.E.2d 514, 517 (1987)).[2] The Virginia Supreme Court has, however, recognized a limited exception to that rule in cases involving fraud, holding that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party." *Id.* In determining whether such an award is appropriate, a court "must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party." *Id.* Applying those principles in *Bershader*, the Virginia Supreme Court affirmed an award of attorney's fees in a common law fraud action, reasoning that "had the chancellor failed to award attorney's fees to the [movants who had been victims of the relevant fraud], their victory would have been hollow …." *Bershader*, 258 Va. 75, 92–93.

Under Virginia law, "'[a]n award of attorney's fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion.'" *Faustini v. Duke*, No. 2750-99-2, 2001 WL 118409, at *5 (Va. Ct. App. Feb. 13, 2001) (citing *Graves v. Graves*, 4 Va.App. 326, 333, 357 S.E.2d 554, 558 (1987)). "The standard for a proper award of attorney's fees is reasonableness under the circumstances." *Id.* (citing *McGinnis v. McGinnis*, 1 Va.App. 272, 277, 338 S.E.2d 159, 162 (1985)).

---

[2]    Virginia law applies because common law fraud is a state cause of action before the Court on diversity jurisdiction.

29

Here, Plaintiff requests an award of attorney's fees and costs in the total amount of $23,309.52. East Decl. ¶ 8. The requested fees are based on billing rates of $380 per hour for Partner Jacob P. East, $510 per hour for Partner Andrew Connors, $300 per hour for Associate Chris Akins, $125 per hour for Paralegal Kandi Fabri, and $150 per hour for Law Clerk Bobbi Smith.

In support of the request, Mr. Newlon submitted the declaration of counsel, Jacob East, which details counsel's experience, the total fees and costs incurred, and attaches invoices reflecting the work performed, costs incurred, dates of the entries, billing rates applied, time expended, and legal professional responsible for each entry. *Id.* Ex. 1.

Upon consideration of Plaintiff's request for attorney's fees and costs, the undersigned finds that the requested rates and hours expended are reasonable and appropriate under the circumstances and in light of the brazen and premeditated nature of the fraud committed by Mr. Sagan, Juicy Brewing's sole owner, and the significant damages incurred by Mr. Newlon. The failure to award attorney's fees in this case would render Mr. Newlon's recovery "hollow" because it would not fully restore him to the position he occupied before the fraud occurred. *See Jacobs,* 83 F.3d at 415 ("The purpose of compensatory damages is to restore the injured party to the party's original condition, i.e., to make the party whole."). Accordingly, the undersigned recommends that the Court award attorney's fees and costs in the amount of $23,309.52.

3. Post-judgment Interest

A court shall order post-judgment interest "on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a); *ExxonMobil Oil Corp. v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755, 769 (E.D. Va. 2016), *judgment entered*, No. 1:16-CV

30

148, 2016 WL 6657395 (E.D. Va. Nov. 9, 2016) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) ("federal law mandates the awarding of post judgment interest")); *PharMerica East, LLC v. Healthlink of Va. Shores, LLC*, No. 2:19-CV-00456, 2020 WL 877983, at *3 (E.D. Va. Feb. 20, 2020) ("In the Fourth Circuit, post-judgment interest can be awarded on the entire amount the court awards.") (citations omitted); *Barrella v. Village of Freeport*, 43 F. Supp. 3d 136, 195 (E.D.N.Y. 2014) ("Post judgment interest is available for an award of attorney's fees arising out of a judgment in the district court.") (internal quotation marks and citations omitted).

Here, an award of post-judgment interest on the compensatory damages and attorney's fees and costs is appropriate to ensure that Mr. Newlon receives the proper value of the damages awarded against Juicy Brewing, regardless of when Mr. Newlon may be able to collect such damages. The post-judgment interest is to be calculated in accordance with 28 U.S.C. § 1961.

### IX. Recommendation

For the foregoing reasons, the undersigned recommends the Court:

(1) **GRANT** Plaintiff's Motion for Default Judgment against Juicy Brewing on Count I (Common Law Fraud);

(2) **DISMISS** with prejudice Counts IV (Fraudulent Conveyance) and V (Securities Fraud);

(3) **ENTER** judgment against Juicy Brewing in the total amount of $373,309.52, consisting of (i) $350,000 in compensatory damages and (ii) $23,309.52 in attorney's fees and costs; and

31

(4) **AWARD** post-judgment interest, to be calculated in accordance with 28 U.S.C. § 1961, on the awarded compensatory damages and attorney's fees and costs.

## X.  Notice

The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service.  Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

*William C. Fitzpatrick*
WILLIAM E. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

May 26, 2026

Alexandria, Virginia

32